UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Crim. No. 21-CR-167 (APM)-2 |
| | : | |
| v. | : | |
| | : | |
| GARRETT HAWKINS | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons herein, the United States requests that the Court sentence the defendant to a period of 151 months, followed by a period of 60 months of supervised release. In support of this sentence, the government states the following:

**I.   FACTUAL AND PROCEDUREAL BACKGROUND**

On March 1, 2021, a federal grand jury empaneled in Washington, D.C. returned a three-count Indictment against the defendant, Garrett Hawkins (hereinafter, "the defendant") and co-defendant Sincere Howard, charging them with Count 1) Conspiracy to Commit Kidnapping, in violation of 18 USC § 3712; Count 2) Kidnapping, in violation of 18 USC § 1201(a)(1); and Count 3) Cyber Stalking, in violation of 18 USC § 2261A(2). The Indictment stemmed from the defendant's participation in the kidnapping and torture of the victim, R.H., in January 2021, which he helped livestream to a viewing audience. The defendant ultimately entered a plea of guilty to Count 2 of the Indictment on February 7, 2023, pursuant to a written plea agreement with the United States, in which the government agreed to dismiss Counts 1 and 3 of the Indictment at sentencing and cap its allocution at the bottom of the applicable sentencing range under the United States Sentencing Guidelines ("USSG").

As part of his agreement with the United States, the defendant agreed to the following factual proffer in support of his guilty plea.

Beginning on January 23, 2021, the defendant and the co-defendant, went to an apartment located at 3532 A St. SE, Washington, D.C., a residence which the co-defendant commonly frequented and which the defendant had been temporarily residing for approximately two weeks. There, they met with the victim (hereinafter, "R.H."), an acquaintance of theirs, and ultimately became involved in an argument with R.H. concerning his apparent theft of a PlayStation 4 gaming console. Both the defendant and the co-defendant began to assault R.H., including stripping him down, pouring cold water on him, and submersing him into that tub of cold water against his will. The defendant and the co-defendant eventually hogtied him with an extension cord and placed him in a closet within the apartment on the evening of January 23, 2021, where he was confined overnight in retaliation for the alleged theft. At all relevant times, the defendant was aware that the co-defendant was armed with a semi-automatic firearm, which he carried on his person and used on at least one occasion to pistol-whip R.H. during the course of that evening.

On the morning of January 24, 2021, the defendant and the co-defendant continued to hold R.H. against his will and kept him within the confines of the apartment. Both the defendant and the co-defendant continued to assault him. Later that evening, at approximately 6:00 p.m., the codefendant began recording videos of R.H. as he and the defendant were confining him and posting them to his Instagram account. Instagram is owned and operated by Meta Platforms, Inc. a company headquartered in Menlo Park, CA, and is a free-access social networking service, accessible by users such as the co-defendant, through its website and its mobile application.

Eventually, approximately one hour later, the defendant, using the co-defendant's phone, began posting a live, rolling video of what was happening to R.H. on the co-defendant's Instagram, otherwise known as a "livestream." As the defendant began filming, the co-defendant once again hogtied R.H.'s wrists and ankles using an extension cord, periodically pulling it to contort R.H.'s limbs and causing him extreme physical pain. While repeating the mantra, "if you steal from the clan we cut off your hand," the co-defendant also placed his boots onto R.H.'s skull and began putting his body weight onto it, once again causing R.H. extreme physical pain. The co-defendant and the defendant also forcibly put left over (but still burning) marijuana cigarettes into R.H.'s mouth, and light them so that R.H. would, in the co-defendant's words, "smoke them until his mother fucking lips burn off." Throughout this initial recording, the defendant told those following the livestream to send in special requests for what V-1 should do or say on camera.

Later on in the evening, the defendant, the co-defendant, and another individual who was communicating with them during the livestream, began to solicit further requests as to what additional acts they should do to R.H. in retaliation for his alleged theft of the gaming console. The defendant and the co-defendant agreed that the performance of certain additional assaultive acts against R.H.'s person would be dependent on the number of viewers for the livestream. Upon crossing the 100-viewer threshold, the defendant and the

co-defendant forced R.H. to strip down in the apartment's bathroom. The third individual communicating with the defendant and the codefendant then suggested that they "whoop his ass," at which point defendant Hawkins took a belt and began whipping R.H.'s back. Later on, once the livestream reached 250 viewers, the codefendant put R.H.'s head in the toilet several times, for a few seconds at a time, and ultimately forces him to drink the toilet water.

Officers ultimately were tipped off to the livestream, identified the location, and entered the apartment on an emergency basis approximately two hours later.  They ultimately observed the defendant, co-defendant Hawkins, and another person coming in from a back bedroom and entering the living room of the apartment, at which point they were detained. In the back bedroom that the defendant had just left as officers entered into the apartment, they found a tan-colored, semi-automatic firearm, with one round in the chamber and eleven in the magazine.

The defendant acted unlawfully, knowingly, and willfully in seizing and confining R.H. overnight, continuing to hold him against his will into the following day, and using the codefendant's Instagram account to broadcast the repeated assaults of R.H. and to determine what acts they should next commit against R.H.'s person.

## II.     DISCUSSION AND RECOMMENDATION

### A.     Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See United States v. Gall, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

>    (4) the kinds of sentence and the sentencing range established for –
>       (A) the applicable category of offense committed by
>       the applicable category of defendant as set forth in
>       the guidelines –
>          (i) issued by the Sentencing Commission ...;
>          and
>          (ii) that, . . . are in effect on the date
>          the defendant is sentenced; ...
>
>    (5) any pertinent policy statement –
>       (A) issued by the Sentencing Commission ... and
>       (B) that, . . . is in effect on the date the defendant is
>       sentenced.
>
>    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>    (7) the need to provide restitution to any victims of the offense.

    B.    <u>Defendant's USSG Calculation</u>

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with the USSG calculation of the U.S. Probation Office ("USPO") with respect to the Total Offense Level, but not its computation of the criminal history score, and thus, not the ultimate offense level.

1. *Total Offense Level*

The base offense level for Kidnapping a violation of 18 U.S.C. § 1201(a)(1), is governed by U.S.S.G. § 2A4.1(a) and begins at an offense level of 32. Pursuant to U.S.S.G. § 2A4.1(b)(2)(B), the base offense level is increased by two levels because R.H. endured serious bodily injury during the commission of the offense. See PSR ¶26. Two more levels are added because co-defendant Howard brandished a loaded firearm during the course of the kidnapping and used it to pistol whip R.H. *Id.* ¶ 27. By entering a guilty plea, the defendant has demonstrated acceptance of responsibility for this offense, reducing her offense level by 2 points. See PSR ¶ 33. The government agrees that the defendant has assisted authorities in the investigation of the defendant's own misconduct and is decreasing the offense by an additional 1 point. See PSR ¶ 34. This results in a Total Offense Level of 33. See PSR ¶ 35. For the reasons discussed below, the United States agrees with USPO and does not believe any further adjustments are applicable, including for USSG §3B1.2.

2. *Defendant's Criminal History*

The government agrees with the PSR that the defendant has accumulated a total of three criminal history points, placing him in criminal history category III. *See* PSR at ¶42.

| Arrest Date | Charge/ Court | Disposition Date and Sentence | Guidelines | Crim. Hist. Pts. |
|---|---|---|---|---|
| 1/28/2019 | Robbery<br><br>Dover, DE | 4/11/2019 –<br><br>Pled guilty 5 years imprisonment, suspended; 6 months work release or home | §4A1.1(a) | 3[1] |

---

[1] The plea agreement was entered into prior to recent amendments to USSG, in which § 4A1.1(d) has subsequently been amended by the U.S. Sentencing Commission pursuant to Amendment 821. As amended, the "status points" provision under redesignated 4A1.1(e) does not apply to individuals like the defendant who present 6 or fewer criminal history points under the other portions of Section 4A1.1. These amendments are in effect as of November 1, 2023, and so his final USSG calculation should not include the additional two "status" points.

| | | confinement; 12 months probation<br><br>03/20/2020: Violation of Probation - 4 years and 3 months imposed, all but 11 months re-suspended; | | |
|---|---|---|---|---|
| | | | | 3 |

3. *USSG Range*

At a Total Offense Level of 33 in Criminal History Category II, the defendant's Guidelines' range is located in Zone D and is 151-188 months.

C. <u>Analysis of the 3553(a) Factors and Allocution</u>

In this case, sentencing is guided by the factors set forth in 18 U.S.C. § 3553(a), as identified *supra* at II.A. A close analysis of each of those factors supports the government's recommendation that the defendant be sentenced to 151 months' incarceration, followed by 60 months of supervised release.

1. *Nature and Circumstances of the Offense*

As this Court is well aware from the litigation surrounding the defendant's pre-trial detention, *see* ECF Nos. 8, 42, the kidnapping the defendant committed in January 2021 involved almost unspeakable acts violence and cruelty visited upon a defenseless victim over the course of 36 hours. Yet what manages to make the defendant's conduct in this case more odious and heinous is the fact that he and his co-defendant broadcast their repeated brutalization of R.H. on the social media platform Instagram.

As the government stated in its Opposition to Defendant's Motion to Revoke the Detention Order, and as the defendant ultimately agreed in the signed, written factual proffer in this case, the kidnapping that co-defendant Howard and the defendant perpetrated began on the night of January

23, 2021, at 3532 A St. SE, in Apartment 101. The apartment was being leased by R.H.'s girlfriend at the time, A.F., but had in essence been taken over by co-defendant Howard and his associates. R.H. returned to Apt. 101 that evening and was accused by the defendant and co-defendant Howard of stealing a PlayStation 4 gaming console that Howard, Hawkins, and others had previously been using that evening. In response to this, R.H. was beaten before the defendants ultimately escalated matters and hogtied him with an extension cord, placing his hands behind his back with his feet. Apparently unsatisfied, they escalated matters still further and placed him in a bathtub of cold water for several hours while still hogtied. With the end of the evening approaching, the defendants, then locked him in a closet overnight, putting a blanket and a pillow in there before ultimately imprisoning him for the evening.

The defendants ultimately continued to keep R.H. as a prisoner for the following day, allowing him out of the closet the following morning and feeding him. Nevertheless, the defendants continued to tie him at various points throughout the day while also throwing cold water and flour on him. As the day progressed, the defendants' kidnapping became increasingly sadistic. The defendants decided to broadcast repeated acts of brutality against R.H. while he was in the process of being kidnapped via the co-defendant's Intsagram account. As the recordings show, R.H. sits placid and still with his back against the wall, while co-defendant Howard initially holds the phone and assaults a visibly injured victim, while Defendant Hawkins (whose black, red, and orange Nike shoes are visible in frame) taunts R.H. See Gov. Ex. 1 at 0:20.

Defendant Hawkins eventually takes the camera, while co-defendant Howard goes behind the television set in the living room and retrieves an extension cord. Yet the defendant did not simply passively sit by pointing the camera in the direction of R.H., instead he provided a play-by-play of why his co-defendant was brutally punishing R.H. and provided unwavering support to

7

Howard in the process. *See id*. at 1:27 ("He stole a PlayStation 4 for seven grams of weed, that man is dead wrong"). As co-Defendant Howard proceeds to hogtie R.H., Defendant Hawkins engages the individuals who are following the livestream and jokes with the co-defendant after Howard says, "when you steal from the clan we cut off your hand." *See id*. at 2:33. Defendant Hawkins then proceeds to taunt R.H. further, noting that he was barred from "Uptown 640" according to a comment in the Instagram Livestream. *Id*. at 3:34. Furthermore, the defendant cautions the Instagram followers not to screen record, *id*. at 4:28, fully cognizant of the criminal activity in which he and co-defendant Howard were engaged and with an eye toward ensuring there would be no evidence preserved of their horrific acts. The defendant then becomes something of an emcee for the broadcast, reading each of the comments and then directing any of those following to let him or co-defendant if they have a "shout out" or special request that they wanted R.H. to say and they would order R.H. to do so because "he owe us." *See id*. at 4:39-4:49. Finally, co-Defendant Howard, having hogtied R.H. by his limbs, begins to pull on the extension cord, contorting V-1's limbs and causing him clear physical pain. *Id*. at 6:40-6:55. All the while, Defendant Hawkins keeps his camera trained on R.H.'s face as he writhes in pain, first from the pulling of the extension cord by which he was bound, and then when Defendant Howard puts his boot on R.H.'s skull and begins applying his body weight. See Gov. Ex. 2 at 0:03-0:13.

 

As Defendant Howard administers this horrific punishment, Defendant Hawkins continues to provide support to co-defendant Howard. Ultimately while still recording for Instagram, the two agree to have R.H. smoke the last end of a marijuana cigarette so that it burns his lips, with Defendant Hawkins lighting it with a Bic lighter in his possession. *See id.* at 1:15. As the flame was getting closer and closer to R.H.'s lips, Hawkins can be heard in the background saying "you want to steal? You want to steal?" while co-Defendant Howard said "Smoke till your lips burn off." *See id.* at 1:32-1:55. Again, during all of these actions, Defendant Hawkins had difficulty controlling his persistent laughter. After this episode, Defendant Howard then continued to apply pressure with his boot to the skull of R.H., while Defendant Hawkins continued in his dual role as both purveyor and inciter of violence, saying on Instagram Live "you steal from the spot, your ass

9

get got." *See id.* at 2:48.  After some followers of the livestream began expressing dismay at the defendants' conduct, Defendant Hawkins attempted to justify their actions as punishment for the alleged theft of the gaming console.  *See id.* at 3:45.

The depraved conduct persisted into the evening, as defendants began to tie certain acts of violence against R.H. to the number of individual Instagram users that were following their particular live feed.  *See* Gov. Mot. Ex. 3.  These acts included forcing R.H. to strip naked and then whipping him with a belt, a punishment administered by Defendant Hawkins.  *Id*.



Finally, after crossing another threshold of followers, the defendants forcibly stuck R.H.'s head in a toilet and consume the toilet water, which R.H. does (with blood from his mouth visibly spilling into the toilet basin).  *See* Gov. Ex. 4.

Case 1:21-cr-00167-APM   Document 76   Filed 12/14/23   Page 11 of 17



As noted in the Statement of Offense, this conduct was in part enabled (and exacerbated) by the co-defendant's use of a firearm, which the defendant was aware of and which the co-defendant used in order to terrorize R.H. into submission and physically assault him.

 

11

\*\*\*

Consistent with USPO's recommendation, *see* ECF No. 69 and 70, there is no basis upon which to reduce the defendant's Base Offense Level pursuant to U.S.S.G. § 3B1.2. for a minor role adjustment and the defendant will be unable to meet his burden with respect to this request. The Application Notes provide the Court with an analytical framework through which to assess whether the defendant has shown he is substantially less culpable, including:

> (i)     the degree to which the defendant understood the scope and structure of the criminal activity;
> (ii)    the degree to which the defendant participated in planning or organizing the criminal activity;
> (iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
> (v)     the degree to which the defendant stood to benefit from the criminal activity.

*See* U.S.S.G. § 3B1.2, Application Note 3(C).

Here, the defendant was engaged in the relevant criminal conduct from the very outset, having been present at the kidnapping's inception and remained by his co-defendant's side at every critical stage of the kidnapping, including the confinement, infliction of various physical punishments, and the broadcasting of this conduct to the viewing audience. The available evidence, moreover, suggests that the two of them had a partnership relationship with one another, as supposed to a principal – agent relationship in which co-defendant Howard was exerting control over the defendant. Both take an equal role in engaging and taunting R.H., humiliating him, talking into the camera to narrate the various punishments they are about to administer, and then eventually assaulting R.H. Indeed, the defendant's very presence itself meant that R.H. was outnumbered, further limiting his opportunity to escape from the apartment. It is true that the co-defendant commits more assaultive acts against R.H.'s person, but this fact in and of itself is not dispositive.

*See United States v. Miller,* 56 F.3d 719, 720 (6th Cir. 1995) ("Although [a] defendant may be less culpable than some of his coconspirators, this does not require a finding that he was substantially less culpable than the others."). While the defendant did not assault R.H. during the hogtying incident, he actively supports and encourages Howard in doing so, playing Howard's actions up for the livestream followers and making sure they can follow everything. Indeed, the broadcasting of this supposed retribution for theft was a key part of the offense, as the livestreamed communicated to other members of the community that the defendants would not tolerate any transgressions lightly against "the clan," or their group, and that they would punish such individuals severely.

Moreover, at no point does the defendant distance himself from the defendant's actions, render aid to R.H., or leave the apartment for protracted periods of time. Nor is there any evidence that he failed to grasp the goals of the criminal activity at issue or the extent of the assaultive perpetrated against R.H. Given his centrality to the conduct at issue, there is no basis in law or fact to warrant any reduction. *See United States v. Acevedo* 824 F.3d 179, 186 (1st Cir. 2016) (upholding District Court's denial of a 3B1.2 reduction and finding "[w]hen the district court said there was nothing 'minor' about driving the abduction vehicle, that was a fair comment on Acevedo's undisputed actions in driving Moreno and another man to the scene of the seizure and transporting the abductors and victim to the hideaway, all of which made him a central actor in the elements of the crime charged."); *United States v. Karas*, 793 F. App'x 380, 386 (6th Cir. 2019) ("Here, as the district court noted, Karas took advantage of her relationship with the victim to lure him to the hotel rather than the restaurant where he wished to meet. As Karas herself explained, she put the victim "into a situation [she] knew wasn't the safest and that could turn out bad." While she may not have exactly predicted the "extent" of the criminal activity, she intentionally lured

13

him to the hotel "for the purpose of robbing" him. Karas failed to present other evidence that she did not grasp the goals of the criminal activity.")

2. *Defendant's Personal History and Characteristics*

The defendant committed the instant offense mere weeks after being released from a state penitentiary in Delaware, where he had been serving a sentence for what amounted to, in essence, an armed robbery. With respect to that case, at the age of 18, the defendant conspired with three other individuals to rob an unwitting victim at knifepoint. In that case, the defendant used the "Let Go" app to lure an unwitting victim to an area out of public view with the promise of selling him an iPhone X, only to rob that individual of his wallet after he and his co-conspirators threatened him with knives and the defendant punched him in the mouth. The defendant ultimately pled guilty in that case pursuant to a plea agreement in which the remaining charges were dismissed as was a companion case, in which the defendant again committed a robbery set up through the Let Go app. Despite receiving an apparently favorable plea agreement as well as non-carceral sentence to begin, the defendant violated the terms of his probation several times, resulting him being re-sentenced to progressively longer periods of incarceration for these infractions, namely 60 days, 90 days, and finally 11 months. Upon the completion of his most recent sentence, on January 9, 2021, he left Delaware for D.C.

Despite having sustained a conviction for a violent felony committed at the age of 18 and having violated his probation in connection with that felony multiple times and suffered the consequences, his prior interactions with the criminal justice system did little to deter him from engaging criminal conduct at issue in this case just 14 days later. Even while incarcerated, the defendant has continued to engage in violent conduct, notwithstanding his counsel's argument in the Motion to Revoke the Detention Order that he had positively adjusted and made as much use

of his time as possible while incarcerated.  *See* ECF No. 41, p. 14.  Indeed the defendant was caught with what appears to be a shank in June 2022, and fought with other inmates on two additional occasions and before telling a female corrections officer earlier this year to "suck [his] dick."  *See* PSR at ¶ 11.  As such, the defendant's protestations that "if given another chance, he could demonstrate to the Court that he has learned from this experience" seem hollow.  *See* PSR at ¶ 23.

While the defendant has endured certain challenges in his upbringing, *see* PSR at ¶ 55, the PSR does not suggest any salient root causes of the defendant's decision to continue to engage in acts of violence, culminating in his participation in the instant kidnapping in January 2021.  The defendant was raised largely by his biological mother's cousin, with whom he continues to have a close relationship and who appears to have attempted to steer him away from the lifestyle he ultimately entered into by sending him out of D.C. to live with her father for a "strong male influence."  *See* PSR at ¶ 55.  Furthermore, it would seem that at the time of his arrest for the instant matter, while he did experience challenges in his brief reintegration into the community, *see* PSR at ¶ 82, he had support in the community and beyond.  Ultimately, there are no readily ascertainable drivers of the defendant's gravitation toward violence that are available in this record and that might mitigate his conduct.  The facts remain that upon release from serving more than a year in jail as a young man, he independently, voluntarily, and willfully decided to commit a heinous kidnapping and broadcasted that kidnapping for all to see.

      3.    *Need for the Sentence Imposed*

As noted above, in evaluating the "need for the sentence imposed" under 18 U.S.C. § 3553(a)(2), the Court should consider a sentence that "reflect[s] the seriousness of the offense, promote[s] respect for the law, and [] provide[s] just punishment for the offense; [] afford[s]

adequate deterrence to criminal conduct; [] protects the public from further crimes of the defendant; and [] provide[s] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).  Here, all of these considerations point in favor of a sentence of 151 months, which represents the bottom of the defendant's Guidelines range.  First, the defendant has committed one of the graver offense in the U.S. Code, as underlined by the fact that the statutory maximum penalty is life incarceration.  Furthermore, the way in which he committed this offense was particularly egregious, confining, brutalizing, and publicly humiliating his captive for a prolonged period of time.  Second, a lengthy sentence is called for to deter future criminal conduct on the defendant's part, particularly as the lenient sentences for his prior violent conduct did little to deter from committing a far more serious offense practically immediately after leaving the custody of the Delaware state prison system.  The government's proposed sentence will also protect the public from further offenses by the defendant while offering him an opportunity to address the various issues which may lie at the root of his embrace of criminal conduct.

  While the defendant is, of course, entitled to ask for a downward variance based on the plea agreement, the government would note that the defendant has already received a significant benefit by virtue of the elimination of the so-called "status points," of § 4E1.1 prior to his sentencing date in this case.  That amendment to the USSG brought Defendant Hawkins down from Criminal History Category III, with five criminal history points, to a Criminal History Category II, with three criminal history points.  The application of the amendment to this case resulted in a 17-month swing from the low-end of the USSG range from 168 months to 151 months.  This shift amounts to a windfall to the defendant and, as such, no further leniency is warranted.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:    */s/ Emory V. Cole & Will Hart*
Emory V. Cole
Will Hart
PA. No. 49136 (Cole)
D.C. Bar No. 1029325 (Hart)
Assistant United States Attorneys
Federal Major Crimes Section
United States Attorney's Office for D.C.
601 D Street, N.W.,
Washington, D.C. 20530
E-mail: Emory.Cole@usdoj.gov
       William.Hart@usdoj.gov
Telephone: (202) 252-7692 (Cole)
       (202)-730-5711 (Hart)

,